# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MEGAN M. DAVIS,                  )
                                 )
                Plaintiff,       )
                                 )
        v.                       )       1:20CV590
                                 )
KILOLO KIJAKAZI,                 )
Acting Commissioner of Social    )
Security,[1]                     )
                                 )
                Defendant.       )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Megan M. Davis, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entries 11, 12 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 15, 18; see also Docket Entry 16 (Plaintiff's Brief); Docket Entry 19 (Defendant's Memorandum). For the reasons that follow, the Court should remand this matter for a calculation of disability benefits.

_____

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging a disability onset date of May 3, 2015. (Tr. 241-49.)[2] Upon denial of that application initially (Tr. 112-27, 151-54) and on reconsideration (Tr. 128-46, 157-59), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 160-61). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 35-79.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 14-27.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 238-39, 336-37), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] last met the insured status requirements of the . . . Act on December 31, 2016.

2. [Plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of May 3, 2015 through her date last insured of December 31, 2016.

3. Through the date last insured, [Plaintiff] had the following severe impairments: diabetes mellitus, status post gallbladder removal, gastroparesis, gastritis, chronic cyclical vomiting syndrome, status post gastric

---

[2] Plaintiff previously applied for DIB on February 22, 2012 (denied at the initial level of review and not pursued further) (see Tr. 113), and on November 27, 2012 (denied by an ALJ on May 1, 2015 (see Tr. 80-98), and finalized by the Appeals Council's denial of Plaintiff's request for review on September 15, 2016 (see Tr. 105-11)).

2

bypass, gastro esophageal reflux disease, opioid
dependence, depression, and anxiety.

. . .

4. Through the date last insured, [Plaintiff] did not
have an impairment or combination of impairments that met
or medically equaled the severity of one of the listed
impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [T]hrough the date last insured, [Plaintiff]
had the residual functional capacity to perform light
work . . . except she can occasionally climb and balance.
She must avoid concentrated exposure to workplace hazards
such as unprotected heights and dangerous machinery. She
is limited to simple work and no fast-paced work, such as
production work.

. . .

6. Through the date last insured, [Plaintiff] was
unable to perform any past relevant work.

. . .

10. Through the date last insured, considering
[Plaintiff]'s age, education, work experience, and
residual functional capacity, there were jobs that
existed in significant numbers in the national economy
that [Plaintiff] could have performed.

. . .

11. [Plaintiff] was not under a disability, as defined
in the . . . Act, at any time from May 3, 2015, the
alleged onset date, through December 31, 2016, the date
last insured.

(Tr. 19-26 (bold font and internal parenthetical citations
omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). Even given those limitations, the Court should remand this case for a calculation of disability benefits.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If

4

there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

5

to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2

---

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

(4th Cir. 1999).[4]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at

---

[4] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65.  If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B.  Assignment of Error

In Plaintiff's first and only assignment of error, she asserts that "[t]he ALJ failed to follow the treating physician rule, rejecting the opinions of treating physicians [Joseph R.] Merrill and [Celia A.] Garner without providing appropriate reasons, relying in [sic] his own mischaracterizations and selective reading of the record to support his rejection."  (Docket Entry 16 at 3 (bold font and single-spacing omitted).)  In particular, Plaintiff contends that the ALJ improperly 1) discounted the opinions of Drs.

---

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

Merrill and Garner because of normal physical examinations, lab tests, and imaging results, when "there is no test to prove Plaintiff has cyclic vomiting syndrome [('CVS')]" (id. at 6 (citing Tr. 24-25)), 2) "cherry picked through the records to claim that all examination findings were normal, lab and imaging results were normal, and [Plaintiff] never vomited" (id. at 5), and 3) "mischaracterized the record to claim that Plaintiff was drug seeking when she was only following the recommendation of her treating physicians" (id.). According to Plaintiff, "[t]he ALJ's decision, supported by nothing more than his cherry picking and mischaracterizations of the evidence, cannot be upheld." (Id. (quoting Arakas v. Commissioner, Soc. Sec. Admin., 983 F.3d 83, 90 (4th Cir. 2020)).) Plaintiff's contentions have merit and warrant remand.

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). The rule also recognizes, however, that not all treating sources or treating

9

source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. See 20 C.F.R. § 404.1527(c)(2)(ii). Moreover, as subsections (2) through (4) of the rule detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence of record. See 20 C.F.R. § 404.1527(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590 (emphasis added). Finally, statements from medical sources (and even treating sources) that a claimant qualifies as disabled or cannot work do not constitute "medical opinions as described in [§ 404.1527(a)(1)], but are, instead, opinions on issues reserved for the Commissioner" and do not warrant controlling weight. 20 C.F.R. § 404.1527(d).[7]

In either February or March 2017, Dr. Garner completed a pre-printed "Medical Report" (Tr. 2357-60), on which she indicated that she had treated Plaintiff approximately every three months since October 2011 for gastroparesis, CVS, type two diabetes, chronic

---

[7] For claims filed on or after March 27, 2017, the Commissioner has significantly amended the regulations governing opinion evidence. The new regulations provide that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. As Plaintiff filed her claim for DIB prior to March 27, 2017 (see Tr. 241-49), this Recommendation has analyzed Plaintiff's claim pursuant to the treating physician rule set out above.

abdominal pain, anxiety, and depression (see Tr. 2357).[8]  Dr. Garner noted that a gastric emptying scan confirmed that Plaintiff had severe gastroparesis, and that "emergency room visits . . . documented electrolyte abnormalities." (Id.)  According to Dr. Garner, Plaintiff would need to take breaks and to lie down in addition to standard workplace breaks and experienced "flares of her illness . . . at least once monthly" which lasted up to five days during which she could not work.  (Id.)  Dr. Garner further opined that, as a result of Plaintiff's symptoms, she could sit for three to four hours at a time and for 8 hours total, stand and/or walk for one hour at a time and for three hours total, frequently lift or carry up to 20 pounds, occasionally lift or carry 21 to 25 pounds, and frequently bend, squat, climb, and reach.  (See Tr. 2358.)  Dr. Garner clarified that, although Plaintiff could work a full day at a simple, sedentary job "with multiple breaks" on her "'good days,'" her illness would cause her to miss more than four days per month and that, during flares, Plaintiff could not work at all.  (See Tr. 2360.)

Dr. Merrill completed the same pre-printed Medical Report form on March 13, 2017 (Tr. 2361-64), and reported that he had treated

---

[8] Dr. Garner's Medical Report reflects both the dates of February 24, 2017 (see Tr. 2360) and March 8, 2017 (see Tr. 2357).  In addition, the record contains only five treatment notes from Dr. Garner on December 27, 2016, January 31, 2017, February 14, 2017, March 8, 2017, and March 24, 2017.  (See Tr. 2370-74, 2382-86, 2397-2401, 2409-12, 2418-22.)

Plaintiff every four to six months since November 2011 for gastroparesis, CVS, and diabetes mellitus (see Tr. 2361). Dr. Merrill indicated that Plaintiff's symptoms included nausea, vomiting, frequent dehydration, intussusception, and chronic abdominal pain, which caused Plaintiff to need "multiple sedating medications, frequent hospitalization," two surgeries, and seven endoscopies. (Id.) Dr. Merrill further opined that, as a result of Plaintiff's impairments, she could sit for one hour at a time and for a total of two hours, stand and/or walk for 10 minutes at a time and for a total of one hour, could not lift, carry, bend, or climb, and could occasionally squat and reach. (See Tr. 2362.) Dr. Merrill believed that Plaintiff could "function on occasion but" that her illness remained "[un]predictable" (Tr. 2363), caused Plaintiff to have good days and bad days (see Tr. 2364), and would result in work absences more often than four times per month (id.).

The ALJ analyzed the opinions of Drs. Merrill and Garner as follows:

> [Dr. Merrill] opined in March 2017 that [Plaintiff] would be capable of sitting up to two hours and standing/walking a total of one hour in an eight-hour workday. She could never lift or carry any weight. She could never bend or climb and occasionally squat and reach. Her symptoms would frequently interfere with attention and concentration needed to perform even simple work tasks. She would miss more than four days of work per month. She would sometimes be able to perform 2-3 hours of sedentary work but 0 hours at other times. The [ALJ] gives this opinion little weight because it is simply inconsistent with the record as a whole. For example, [Plaintiff]'s physical exams throughout the relevant

12

period were essentially normal. Further, consistent with the discussion above, despite her numerous emergency department visits, many of them revealed normal lab and imaging results, no actual vomiting, and chronic drug seeking behavior. Accordingly, the record does not support such severe limitations.

[Dr. Garner] opined in July [sic] 2017 that the claimant would be able to sit for a total of eight hours and stand/walk for a total of three hours. She would need to take extra breaks during the day. She could occasionally lift/carry 21-25 pounds and frequently carry less. She would be unable to work frequently due to flares. She could frequently bend, squat, climb, and reach. Her symptoms would occasionally interfere with attention and concentration. She would miss more than four days of work per month. The [ALJ] gives this opinion little weight because it is simply inconsistent with the record as a whole. For example, [Plaintiff]'s physical exams throughout the relevant period were essentially normal. Further, consistent with the discussion above, despite her numerous emergency department visits, many of them revealed normal lab and imaging results, no actual vomiting, and chronic drug seeking behavior. Accordingly, the record does not support such severe limitations.

(Tr. 24-25 (internal parenthetical citations omitted) (emphasis added).) Plaintiff challenges the ALJ's above-emphasized, identical bases for discounting the opinions of Drs. Merrill and Garner on three grounds, all three of which have merit and collectively warrant remand.

1. Objective Evidence of CVS Flares

First, Plaintiff contends that, "[i]n order to understand the full extent of the ALJ's errors, one must first understand Plaintiff's condition." (Docket Entry 16 at 5.) In that regard, Plaintiff notes that "'[CVS] is a disorder that causes recurrent

13

episodes of nausea, vomiting, and tiredness (lethargy) . . . [which] last anywhere from an hour to 10 days . . . [and] can occur regularly or apparently at random, or can be triggered by a variety of factors.'" (<u>Id.</u> (quoting U.S. National Library of Medicine, *Cyclic Vomiting Syndrome*, https://medlineplus.gov/genetics/cyclic-vomiting-syndrome/#causes).) Plaintiff further observes that "'[t]he determination of CVS can only be made after other causes of recurrent vomiting have been ruled out'" and that "'[t]here is no test to prove the presence of [CVS].'" (<u>Id.</u> at 6 (quoting National Organization for Rare Disorders, *Cyclic Vomiting Syndrome*, https://rarediseases.org/rare-diseases/cyclic-vomiting-syndrome).) Thus, Plaintiff maintains that "the ALJ['s] reject[ion of] the opinions of [Drs. Merrill and Garner] because physical examinations were normal[] and lab and imaging results were normal . . . actually requir[ed] Plaintiff to provide evidence that does not exist." (<u>Id.</u> (citing Tr. 24-25).)

The ALJ erred by relying on purportedly normal physical examinations and imaging results to discount the opinions of Drs. Merrill and Garner. The ALJ observed several times in his decision that Plaintiff's physical examinations remained generally normal (<u>see</u> Tr. 22, 23), "except for mild left flank, left upper quadrant, and minimal right flank tenderness" on July 17, 2015 (Tr. 22 (referencing Tr. 1156)); however, the ALJ neither elucidated what findings on physical examination would have sufficed to demonstrate

14

a CVS flare nor why findings of abdominal tenderness did not so suffice (see Tr. 22-24). See Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017) (remanding, in part, because "the ALJ did not indicate how the [normal] results he cited were relevant to the functional limitations [the plaintiff] suffered as a result of her chronic, non-exertional pain in her left shoulder"); Monroe v. Colvin, 826 F.3d 176, 190 (4th Cir. 2016) ("In citing 'normal' results from pulmonary and respiratory tests and an EEG, the ALJ did not explain why he believed these results had any relevance to the question of what symptoms [the plaintiff] suffered from narcolepsy.").

Similarly, despite the ALJ's statement that, "consistent with [his] discussion [of the medical evidence]," "many" of Plaintiff's "numerous emergency department visits . . . revealed normal . . . imaging results" (Tr. 24, 25), the ALJ did not discuss any imaging results in his decision (see Tr. 22-24). Moreover, although the record contains normal CT scans of the pelvis and abdomen (see Tr. 1503 (2/3/15), 1567 (5/10/15), 2070 (9/21/16)), normal renal and pelvic ultrasounds (see Tr. 1182 (7/15/15), 1461 (8/21/15), 1505 (2/3/15)), and normal abdominal x-rays (see Tr. 1504 (2/3/15), 2071 (9/21/16)), medical providers administered those tests to rule out other causes of Plaintiff's symptoms, such as diabetic complications, abdominal aorta aneurysm, bowel obstruction, kidney stones, diverticulitis, or appendicitis (see, e.g., Tr. 936, 1182,

15

1513, 1555), rather than to diagnose or rule out CVS. The ALJ therefore erred by discounting the opinions of Drs. Merrill and Garner regarding Plaintiff's CVS flares on the basis of purportedly normal physical examinations and imaging results.

## 2. Cherry-Picking

Second, Plaintiff contends that "[t]he ALJ ignored several pieces of evidence that are inconsistent with his determination" (Docket Entry 16 at 6), and "only chose to discuss certain visits, or portions of visits, to make it seem that Plaintiff always appeared normal" (id. at 7). According to Plaintiff, "the ALJ's decision, riddled with cherry picked facts and mischaracterizations of the record as a whole, cannot be upheld." (Id. at 9 (citing Arakas, 983 F.3d at 99).)

Although the ALJ here labored under no obligation to discuss every piece of evidence in making the RFC determination, see Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014), he could not limit his discussion to records that show benign results while ignoring a significant number of records that reflect findings supportive of Plaintiff's claim for disability, see Arakas, 983 F.3d at 98 ("In evaluating a disability claim, an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." (internal quotation marks and brackets omitted) (quoting

16

Lewis, 858 F.3d at 869 (in turn quoting Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010)))).

As a general matter, the administrative transcript in this case consists of 2,894 pages and contains records from more than 40 emergency room visits during the period starting on May 3, 2014, one year prior to Plaintiff's alleged onset date, and ending on December 31, 2016, Plaintiff's date last insured for benefits (see Tr. 779-2268). The ALJ confined his discussion of that evidence to one and a half pages of his decision, and discussed only a few emergency room visits in any degree of detail. (See Tr. 22-24.) Such a terse summary of a voluminous record raises a red flag, but would not warrant remand if the ALJ's discussion nevertheless fairly captured the essence of Plaintiff's treatment during the relevant period. Here, for the reasons described more fully below, the ALJ's discussion falls short.

To begin, after stating that "many" of Plaintiff's "numerous emergency department visits . . . revealed normal . . . imaging results" (Tr. 24, 25), the ALJ entirely failed to discuss Plaintiff's stomach biopsy, which showed "mixed acute and chronic gastritis" (Tr. 1981 (12/11/15)), or endoscopy, which demonstrated "a quite agitated stomach lining" (Tr. 1982 (12/11/15)). (See Tr. 22-24.) Similarly, although the ALJ found that "many" of Plaintiff's emergency interventions reflected "normal" laboratory test results (Tr. 24, 25), the ALJ failed to acknowledge that

17

Plaintiff's blood work did show signs of dehydration on multiple occasions (see Tr. 808, 1259, 2022, 2042, 2095) and, in one instance, metabolic acidosis (see Tr. 2047).

Along those same lines, the ALJ stated that Plaintiff's "physical examinations throughout the relevant period were essentially normal" (Tr. 24, 25), but the record actually reflects that examinations consistently showed significant distress (further demonstrated by tachycardia, substantially elevated blood pressure, and increased respirations and/or hyperventilation) and abdominal tenderness (see Tr. 1156 (mild abdominal tenderness), 1261 (in some distress, flank pain), 1438 (uncomfortable appearance, tachycardia, abdominal tenderness), 1478 (moderate distress, mild abdominal tenderness), 1526 (uncomfortable appearance), 1555 (abdominal tenderness), 1631 (very tearful), 1636 (acutely hyperventilating, tachycardia), 1641 (obviously uncomfortable, mild to moderate abdominal tenderness), 1646 (very anxious), 1653 (mild, diffuse abdominal tenderness), 1676 (anxious and tearful, some abdominal tenderness), 1700-01 (moderately ill and pale, abdominal tenderness), 1719 (blood pressure 127/112, heart rate 124, quite emotional and upset, tearful, significantly depressed), 1783 (blood pressure 158/113, heart rate 112, respirations 22, moderate distress), 1802 (abdominal tenderness), 1827, 1830, 1852, & 1853 (blood pressure 161/120, heart rate 114, respirations 24, anxious, tearful, frustrated, mild, diffuse abdominal tenderness), 1897-98

18

(blood pressure 157/85, somewhat pale, mild, diffuse abdominal discomfort, hypoactive bowel sounds), 1904 (moderate abdominal and costovertebral angle tenderness, tachycardia), 1928 (uncomfortable appearance, abdominal tenderness), 1978 (moderate distress, abdominal tenderness), 1983-84 (uncomfortable appearance, tearful, quite miserable), 1987 (mild, diffuse abdominal tenderness), 1994-95 (very upset, uncomfortable, crying, mild abdominal tenderness), 2001 (mild to moderate abdominal tenderness), 2003-04 (crying and emotionally distraught, tachycardia), 2009-10 (emotionally distraught, blood pressure 158/85, heart rate 133, hyperventilating), 2019 (tearful, emotionally fatigued, blood pressure 156/96, heart rate 119, mild abdominal tenderness, costovertebral angle tenderness), 2026 (tearful and crying, tachycardia, respirations 24), 2031 (appears to feel quite poorly, mildly anxious, tachycardia, diffuse abdominal tenderness), 2042 & 2046 (quite anxious, hyperventilating, blood pressure 187/117, flat affect, looks tired and ill), 2085 (blood pressure 179/98, tachycardia, respirations 22), 2091, 2095, & 2097 (very jittery and anxious, tachycardia, abdominal tenderness, quite tearful, visibly anxious), 2099 (chronically ill-appearing), 2238-39 (looks somewhat down and fatigued, flat affect, mild abdominal tenderness)), and sometimes reflected signs of dehydration (see Tr. 1676 (appears mildly dehydrated), 1802 (dry mucous membranes), 1928 (appears

19

somewhat dehydrated, oropharynx mildly dry), 2092 (dry mucous membranes), 2238 (a little dry and dehydrated)).

Notwithstanding the ALJ's remark that "many" of Plaintiff's hospital visits reflected "no actual vomiting" (Tr. 24, 25), those records not only showed "actual vomiting" (see Tr. 1478, 1526, 1701, 1897, 1984, 2032, 2092), but also retching, dry heaving, and spitting (see Tr. 1439 (retching), 1641 (actively retching), 1648 (spitting), 1700 (dry heaving), 1803 (spitting), 1827, 1830, & 1852 (actively retching, spitting), 1897 (dry heaving), 1977 (retching), 1995 (dry heaving), 2019 (dry heaving); see also Tr. 1185 (nasogastric tube placed draining bilious vomitus), 1261 (nasogastric tube draining bilious secretions)). Notably, the ALJ did not grapple with the evidence of Plaintiff's recurrent episodes of nausea leading to retching, dry heaving, and/or frequent spitting into an emesis bag. (See Tr. 24-25.)

In sum, because the ALJ "erred by cherry-picking certain facts" and by "mischaracteriz[ing] other material facts," his "decision based on such errors can hardly be supported by substantial evidence." Arakas, 983 F.3d at 99.

3. Drug-Seeking Behavior

Third, Plaintiff asserts that, "[w]ithout any support whatsoever in the record, the ALJ determined Plaintiff engaged in 'chronic drug seeking behavior,'" which "directly [] result[ed] from] the ALJ's picking and choosing throughout the record."

20

(Docket Entry 16 at 9.) In that regard, Plaintiff challenges the ALJ's reliance on a positive drug screen (id. (citing Tr. 23)), noting that the treatment providers questioned whether the results constituted false positives (id. at 9-10 (citing Tr. 1558)). Plaintiff further contests the ALJ's characterization of Plaintiff's statements to emergency room doctors that Dr. Merrill recommended intravenous Dilaudid to treat Plaintiff's CVS flares as untrue. (Id. at 10 (citing Tr. 23).) According to Plaintiff, "Dr. Merrill instructed Plaintiff to continue to seek treatment in the emergency room to obtain [intravenous] narcotics and benzodiazepines during her [CVS] cycles" (id. (citing Tr. 2187)) and thus "Plaintiff [wa]s not drug seeking but following recommended treatment" (id.).

Contrary to Plaintiff's contention that the ALJ found that Plaintiff engaged in drug-seeking behavior "[w]ithout any support whatsoever in the record" (id. at 9 (emphasis added)), the record contains some evidence suggestive of drug-seeking behavior in that the ALJ observed that Plaintiff had a positive drug screen for Oxycodone and PCP that her medical providers could not explain (see Tr. 23 (citing Tr. 1558)). Although not discussed by the ALJ (see Tr. 22-24), treatment records during the relevant period also reflected that emergency room providers refused to refill Plaintiff's oral narcotics prescription on two occasions, because Plaintiff had already received a refill too recently (see Tr. 1558,

21

1803), as well as that several providers questioned whether Plaintiff's recurrent vomiting and abdominal pain resulted from opioid withdrawal (see Tr. 2001 (1/27/16), 2003 (2/1/16 - noting that Dr. Merrill took Plaintiff off oral opiates in December 2015), 2085 (9/19/16)).

Nonetheless, the ALJ still erred with respect to his drug-seeking finding. Beyond the lone positive, unexplained drug screen, the ALJ's stated bases for drug-seeking finding all centered on Plaintiff's use of intravenous Dilaudid: 1) her statement to an emergency room provider that her home health management could not handle her complicated symptoms and that she needed instead to come to the emergency department for intravenous Dilaudid (see Tr. 23 (citing Tr. 1646)), 2) Plaintiff's repeated requests for Dilaudid by name (see id. (citing Tr. 1828, 2001)), 3) an emergency room provider's observation that Plaintiff's nausea immediately resolved after administration of intravenous Dilaudid even though that drug did not treat nausea (see id. (citing Tr. 2001)), and 4) the ALJ's characterization as untrue of Plaintiff's reports to emergency room doctors that Dr. Merrill recommended Plaintiff receive intravenous Dilaudid to break her CVS cycles (see id. (citing Tr. 1828)). Although the record reflects that, initially, an emergency room provider could not confirm Dr. Merrill's recommendation that Plaintiff receive intravenous Dilaudid to break her CVS cycles (see Tr. 1828 (reflecting that Dr.

22

Merrill's treatment notes failed to contain that recommendation and that on-call gastroenterologist at Dr. Merrill's practice did not feel that Dilaudid constituted appropriate CVS treatment)), that provider later acknowledged that he had spoken with Plaintiff's primary care physician who, in turn, had spoken to Dr. Merrill, who recommended that Plaintiff receive intravenous Dilaudid and Ativan (see Tr. 1831; see also Tr. 1898 (emergency room visit the next day reflecting telephone call from Dr. Merrill authorizing use of opiates for Plaintiff's acute CVS episodes)). Dr. Merrill's records also make abundantly clear that he authorized intravenous Dilaudid to treat CVS flares. (See Tr. 2161 ("[Plaintiff's CVS] nausea has been best controlled with [intravenous] benzo[diazepines] and [D]ilaudid. [] I have no concerns about the [intravenous] narcotics she receives in the emergency room to break her cycles. . . ."). Thus, as Plaintiff correctly observes (see Docket Entry 16 at 10), her requests for intravenous Dilaudid followed her treating gastroenterologist's recommended treatment regimen.

    4. Harmlessness

For the reasons described above, the ALJ committed legal error and failed to provide substantial evidence to support his analysis of the opinions of Drs. Merrill and Garner. Plaintiff contends that the ALJ's errors in evaluating and weighing the opinions of Drs. Merrill and Garner qualify as "harmful, as both doctors opined

23

Plaintiff was disabled" (Docket Entry 16 at 11) because "her
condition would cause her to miss too much work" (id. at 13), and
the VE "testified that, if limited as opined by [Drs. Merrill and
Garner], there [we]re no jobs available in the national economy
Plaintiff c[ould] perform" (id. (citing Tr. 75, 78)).  Indeed, the
ALJ's failure to provide sufficient grounds to discount the
opinions of Drs. Merrill and Garner does not qualify as harmless,
because those doctors' opinions that Plaintiff could not work
during her CVS flare-ups and that her impairments would cause her
to miss work more than 4 days per month (see Tr. 2357, 2360, 2364),
if credited, would preclude all competitive work (see Tr. 75-78).

5.  <u>Remand for a New Hearing or Reversal for an Award of Benefits</u>

Plaintiff requests that the Court reverse her case "for a
calculation of benefits," because "both of Plaintiff's treating
physicians opined she could not work, and th[o]se opinions are
highly supported by the record."  (Docket Entry 16 at 14.)
According to Plaintiff, "[t]here is no purpose to another hearing,
as the record establishes Plaintiff is disabled."  (Id. (citing
<u>Bilotta v. Saul</u>, 850 F. App'x 162, 171 (4th Cir. 2021)).)

The record reflects that Plaintiff spent time in emergency
rooms on <u>at least</u> 50 days from her alleged onset date to her date
last insured (a period of 608 days), which translates to, <u>on</u>

24

average, every 12 days. (See Tr. 1155-2268.)[9] Those calculations do not even take into account days on which Plaintiff had symptoms significant enough to render her unable to work at a competitive job but not severe enough to warrant emergency intervention. (See, e.g., Tr. 1582 (indicating Plaintiff had battled nausea, vomiting, and abdominal pain for one week before coming to emergency room), 1641 (reflecting that Plaintiff had experienced CVS flare for last 24 hours prior to hospitalization), 1653 (documenting complaint of nausea and vomiting for two days), 1903 (recording report of severe nausea, vomiting and abdominal pain since day before emergency room visit), 1977 (12/8/15 emergency room visit containing Plaintiff's remark that current CVS flare began over Thanksgiving).) Thus, the record convincingly supports the opinions of Drs. Merrill and Garner regarding both Plaintiff's inability to work during CVS flare-ups and her likelihood of missing more than four days of work per month due to such flares.

When, as here, evidence of drug-seeking behavior exists in the record, an ALJ could conceivably, upon remand, find that Plaintiff qualified as disabled, but also deny benefits by finding Plaintiff's substance abuse a contributing factor material to the determination of disability. See 20 C.F.R. § 404.1535. The

_____

[9] The record indicates Plaintiff was hospitalized in Texas, Hawaii, and Mississippi while staying in those areas (see Tr. 1719, 1897, 2072), and also references other emergency room visits during the relevant period which do not appear in the record (see Tr. 1478, 1631, 1783).

current record, however, forecloses such a materiality finding for two reasons. First, as discussed above, in requesting intravenous Dilaudid, Plaintiff followed the recommendations of her treating gastroenterologist (who also prescribed Plaintiff oral narcotics, see Tr. 2143, 2147, 2150, 2164, 2189, 2199, 2202)), thus distinguishing this case from those where a claimant uses illegal street drugs, abuses alcohol, or takes narcotics against his or her doctor's recommendations. Second, Plaintiff underwent multiple invasive measures to gain control of her symptoms of recurrent nausea, vomiting, and abdominal pain, including placement of nasogastric tubes (see Tr. 1185, 1261), gastric bypass surgery (see Tr. 1921-23), which then led to multiple endoscopic balloon dilations to remedy strictures in the gastrojejunal anastomosis (see Tr. 2200, 2217-18, 2034, 2678, 2545), and surgical insertion of a feeding tube (see Tr. 2774-86), which a surgeon removed less than a week later due to an infection and abscess (see Tr. 2702-73). Because Plaintiff undertook these significant measures to try to alleviate her symptoms, which would, if successful, decrease the likelihood of her needing intravenous Dilaudid or oral narcotics, her actions remain flatly inconsistent with a true drug-seeker, whose singular goal consists of receiving narcotics on a continual basis.

Because "the record clearly establishes [Plaintiff]'s entitlement to benefits and another ALJ hearing on remand would

26

serve no useful purpose," <u>Bilotta</u>, 850 F. App'x at 171, the Court should remand for a calculation of disability benefits.  <u>See</u> <u>Arakas</u>, 983 F.3d at 112 (reversing for an award of benefits where "the ALJ erred in . . . according little weight to [the] treating physician's opinion" that established the claimant's disability); <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 109 (2d cir. 2003) (awarding benefits because ALJ erred in failing to accord controlling weight to treating rheumatologist's opinion containing disabling limitations).

### III. CONCLUSION

Plaintiff has established entitlement to reversal and remand for a calculation of benefits.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated and that the matter be reversed and remanded under sentence four of 42 U.S.C. § 405(g) for a calculation of disability benefits.  As a result, Defendant's Motion for Judgment on the Pleadings (Docket Entry 18) should be denied and Plaintiff's Motion for Judgment Reversing Decision of the Commissioner of Social Security (Docket Entry 15) should be granted.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

October 6, 2021